All right, our fifth case for this morning is United States v. Wilson. Mr. Goodridge. Good morning, Your Honors. Greetings from Southern Indiana. This is a direct appeal from a conviction following an eight-day jury trial in the United States District Court for the Southern District of Indiana, Indianapolis Division. Judge Borker, I was not the trial counsel, but I was retained to do his appeal. This case started, I believe, the criminal conduct which is alleged in the indictment in 2009. It's summed up, I think, by the end of 2011. My client was brought into it through the fact that he was CEO of a company named Imperial. He had attended a seminar at Rolls-Royce Institute in Terre Haute, Indiana. He had met the Ducey brothers. The Ducey brothers were operating a biofuel company there in central Indiana and they were experiencing financial difficulties. They talked to each other and the ball got rolling. So explain to me, Mr. Goodridge, why, you know, even if you, even if a person, I realize not you, but even if a lawyer could make an argument to a jury that Mr. Wilson was not aware about what the alchemy scheme was all about and all of that, that there was on the other side actually a rather large amount of evidence from which a rational jury could infer that he was perfectly aware of it and that's what this jury did come to the conclusion of. So why is this an appellate issue? It's not our job to be another round of jury. Yes, respectfully, I do agree. No, you can sit down. I'm not telling you you have to. I do agree to a large extent. When I was reviewing this transcript and I was reviewing this record, I had many of the same concerns that you have in exactly what you just said. I've met with my client several times after his incarceration to the BOPS commitment. I've traveled to Alabama. I've met with him there. How long a sentence did he get for this? 120 months, I believe, 10 years. It wasn't a very harsh sentence from Judge Barker. I didn't see it as very, very harsh sentence, but it was 120 months. We heard earlier today that a two-year sentence was unreasonably harsh in a fraud case, but okay. I didn't agree with the appellant's stance on that. We won't go there. Okay, not your case. So proceed. So we have all this evidence. He did know that he has the spreadsheet, there are tapes, there are, you know, meetings. He knows there's no glycerin. I mean, there's just a lot of evidence, even if you don't have him standing on the, you know, in the middle of the Indiana University campus shouting, you know, I'm defrauding the government. Yes, Your Honor, and before coming into the courtroom I met with the United States Attorney and I've met him for the first time and I believe that was the topic of our conversation. The fact of the matter is this, though. There are exceptions that I take with trial counsel strategy in decisions that they made in presenting a defense. I don't know if a scienter defense for mens rea on lack of knowledge, so can he form the requisite mens rea to commit a securities offense as compared to mail fraud, wire fraud, any other type of criminal offense, was the appropriate move here. But I've been doing this a little while and I'm very, very aware of Judge Easterbrook's stern warning, and I will never cross that line. You don't raise 2255 issues on And you haven't done that. Could you perhaps address, Mr. Goodrich, the government has a passage in their brief on page 15. It's entitled, Wilson's False Statements to Government Agents. Yes. Could you, there was no reply brief in this case, but I was wondering what your response to that portion of My response to the portion of that brief is, my client went to those meetings without representation initially. At the time that he went to those meetings, he was not, or the government was not possessed of this by cell comparison that was not created by my client, but was instead created by one of the Ducey brothers, who I think evidence is conclusive, is a pretty effective, well-educated crook. And in that comparison, what the comparison was, I believe, is a comparison to buying what was as to purchasing the feedstock. And I think the difference was they lost 21 cents per gallon if they're actually doing the feedstock, but then you kick over to, you're buying this off-spec stuff, they're making 40. They're not doing anything in this plant. The whole thing is mothballed, as far as I can tell. And he's not even telling the investors about the off-spec theory that he's offering in trial. Well, that goes to the knowledge defense. That is correct, but in specific reference to the interview that the court had asked me to talk about, the charge was false statements to the government agents. My client didn't make a materially false statement. His statements, which were made a fact, if you break down the diction of the exact sentence, were true. His responses were true. He did not do the comparison. Mr. Ducey did. Did he receive it? He received it, but there is no evidence that he read it. Well, why don't we leave it there for the moment, since you're in your rebuttal time, and you can respond to whatever the government has to say. Yes, ma'am. Mr. Schmidt. May it please the court, Jake Schmidt on behalf of the United States of America. With the court's permission, I'd like to address some of the points that were just covered in counsel's argument. First of all, as to the time frame of the scheme, there are basically two separate criminal schemes that went on. One was the alchemy scheme that you referred to. Mr. Wilson, however, was convicted of securities fraud. There was an entirely separate- Forms, as I recall from your brief. Eighteen counts of securities fraud and one count of lying to the agents. But there was a separate criminal indictment that covered the alchemy scheme, which included false statements under the Clean Air Act and violations of other related laws regarding the government incentives for the biofuels. The lies that Mr. Wilson told were to investors. And so that occurred in the 2010 to where e-biofuels immediately became 99% of their revenues. And he told lies about what was happening at the biofuels plant. That's what he was convicted of, not the false statements to the IRS or the EPA or any of that. Two, as Judge Hamilton pointed out, the sentencing, it was well below the guidelines, just in case that issue was of any interest. Now, as to the false statements came out the way they did without the agents having that make-versus-buy spreadsheet, because he basically offered those statements, which were then shown to be knowingly false by a document that he had in his possession, that he ended up turning over to the SEC. This is the make-versus-buy spreadsheet? Yeah, correct. And it's actually significant that we didn't even come up with that name. That is the name of the spreadsheet, right? Do we want to make this stuff or do we want to buy it from somebody else? I mean, there's nothing wrong with making or buying as long as you're not fooling around with the tax incentives at the same time, I assume. And as long as you're telling investors that you're doing that. Yeah, right. You're just a middleman. Correct. So whether there's evidence that he read it, there actually is evidence that he read it. The testimony at trial was from Craig Ducey, who was the president of e-biofuels. He was a lawyer. He would have been in this case until he pled guilty, cooperated with the government, testified against Mr. Wilson. And what he said is, he sent him the spreadsheet, they then got together, they discussed it, they went through each of the various processes laid out in that spreadsheet, and Mr. Wilson said, I want you to do more of the profitable buy strategy. Do that. Because we make money. And if we turn the plant on, we lose money. And I don't want to do that. Didn't they at the end of this, they did try turning the plant on and it turned out to be difficult to get it back up and running? Correct. So about a year after Mr. Wilson came on the scene, he went out to New Jersey to meet with the middleman who sort of bought the fuel and then relabeled it as soybean oil or whatever agricultural input they wanted to pretend it was. And what that guy said, Mr. Joseph Ferrando, he said, you have to buy some real feedstock. We can't have a situation where it's 100% alchemy. It's too risky. So you've got to buy chemicals that are used in biodiesel production. You've got to do stuff. And the quote that was from Miss Patterson, he said, I don't care if you pour down the drain, but it's got to show up on the books. So at that point, it's a year into it, Mr. Wilson goes out there and he says, look, the plant's not running. And if you want us to start it again, it's going to take some time. We'll try to do it. And there is evidence that they tried to do it throughout the summer. And it was really, really difficult to get that plant to do anything. But meanwhile, the alchemy is still going strong. Is this like a big industry in Indiana that manufactured this biodiesel? I'm just wondering how, what kind of markets out there on the legitimate side, or anywhere for that matter, in Texas and New Jersey? Well, if this plant would have produced the volume that it claimed that it produced, it would have been 4% of the biodiesel production in the United States during the time period. Now, you can go to gas stations, pilot, other places, and you'll see things that are called like B10 or B20, right? So that's 80% petroleum diesel, 20% biodiesel. So you can take this stuff, put it into a diesel engine and it will run at certain percentages. So there is a market for it. The problem that eBio had is they couldn't profitably make it unless they cheated on incentives. Now, that's why I was just wondering whether that's generically a problem, whether this is just one of those technologies that hasn't quite taken off yet, or whether they just happen to be really bad at it. I think it's generally a problem, but when you add in the incentives, it makes it profitable. When you add in incentives without actually any cost of production, it's incredibly profitable. It's really profitable. Right. And that's what we had here. So one other point about the offspec, there was trial testimony about that. And the trial testimony from, again, Craig Ducey was that the term offspec is a cover story. Mr. Wilson knew it was a cover story. They told, and the reason they had to tell that cover story was that the plant had a 15 million gallon capacity and they were selling 25 to 30 million gallons a year. So they had to have an excuse for how did they get from 15 to 30, right? And so they came up with this offspec story. But the trial testimony is everybody on the inside knew that that was a lie. Did they tell investors about the offspec? Well, it's interesting. They told one investor, a hedge fund that came out and did due diligence, hired a renewable energy expert, came out to the plant in the summer of 2011. They told them about that to justify the volume. That person walked away from the deal and said, that sounds illegal. The next group of investors, the pipe investors, later in the fall of 2011, they went back to the first story and they didn't mention offspec at all. But do the SEC filings reflect the offspec story? There's one reference to it at the very end in November 2011. And all it says is we have the capability to reprocess offspec. They don't say that they're doing it. Not that they were doing it. Okay. Yeah. If there aren't any more questions. I see none. Thank you, Your Honor. All right. Thank you. Mr. Goodrich. Amazingly, all the questions and topics are relevant to Judge Hamilton's first inquiry. There's a reason the brief reads the way it does. There's a reason why the sole argument presented is the argument presented by trial counsel as to why the jury's verdict should be 2255. With regard to Judge Hamilton's issue, there's evidence not in the record which was not placed into the record regarding the buy sell sheet and how it ended up in my client's It was, I believe, at some point it will come to light that it was given to him back by the SEC as corporate records and then he turned it over. So it was part of an investigation that he collected the records from and then he turned it over to the government. There was testimony, there was testimony at trial for Mr. Ducey that they talked about it, right? There was, but if you're allowed to put in the other evidence, then it's, was that person properly cross-examined? Maybe. I got to ask before we finish. What is a Texas ghost load? A Texas ghost load is basically the original alchemy scheme, which really wasn't a part of this and that's why I didn't deem the defense strategy as being appropriate for this type of case at trial and I'm not arguing IEC, but I'm trying to explain. Not yet, so we understand. But I will be, I'll be back probably. A Texas ghost load is quite frankly, you need a transload facility because what you're trying to do is you're trying to buy B1, you're trying to buy B99 fuel, which is ethanol that's been splashed with diesel and you're trying to turn that into B100. Well, turning it into B100, there's no scientific process for that. It is impossible. You cannot do that through transesterification. You can't take out the 1% of oil you put in. Can't do it. But they want to say they can do it. So what they do is they go to New Jersey, have it shipped in, not even that, I think the provider was over. I thought they were down in Houston. They were just going from one plant to another. That's, well, we're getting there. Okay. We need to move there a little more quickly. I will. The fuel is delivered to the trans, to a facility by which they put it in one pot, bring it out of a truck, bring a different truck, fill another truck, send it to the customer. And that is on the books. The paper's right. The ghost load is where you don't use that intermediary. And what you're doing is you're driving... You fake the fake. You save money by not bothering to unload. It's still fake. Okay. But you're going directly from one refinery to the other. Yeah. And that's where the fax is coming from. Thanks. All right. Thank you very much, Mr. Gingrich. Thank you. Thank you as well to the government. We'll take the case under advisement.